**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 02-10138
_____


INTERSTATE CONTRACTING CORPORATION,

Plaintiff-Appellee,


versus


CITY OF DALLAS, TEXAS

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Texas

_____

February 4, 2003

Before EMILIO M. GARZA and CLEMENT, Circuit Judges, and DAVIS[*], District Judge.

LEONARD DAVIS, District Judge:

This diversity case involves important questions of state law which the Texas courts have not as yet resolved. Accordingly, we certify the unresolved questions of state law raised in this matter to the Supreme Court of Texas.

**CERTIFICATE FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS, PURSUANT TO THE TEXAS CONSTITUTION ART. 5, § 3-C AND RULE 58 OF THE TEXAS RULES OF APPELLATE PROCEDURE TO THE SUPREME COURT OF TEXAS AND THE HONORABLE JUSTICES THEREOF:**

_____

[*] District Judge of the Eastern District of Texas, sitting by designation.

1

## I. STYLE OF THE CASE

The style of the case in which certification is made is *Interstate Contracting Corporation, Plaintiff-Appellee versus City of Dallas, Texas, Defendant-Appellant*, Case No. 02-10138, in the United States Court of Appeals for the Fifth Circuit, on appeal from the United States District Court for the Northern District of Texas. Federal jurisdiction is based solely on diversity of citizenship.

## II. STATEMENT OF THE CASE

The facts relevant to the certified questions presented are not in dispute. On September 14, 1994, Plaintiff City of Dallas, Texas (the "City") and Defendant Interstate Contracting Corporation ("ICC") entered into a fixed sum contract for the construction of levees around a City water treatment plant; the excavation of two areas to create storm water detention lakes; and some miscellaneous work including trash removal, surveying, and linear depth checking. In turn, ICC entered into two written subcontracts with Mine Services, Inc. ("MSI") for the levee construction and the excavation of the storm water detention lake.

The material excavated for the lakes was to be used, to the extent it met specifications, to construct levees. The levees were to consist of "random fill," with a PI[1] range of 4 to 15. In October 1994, MSI began by mobilizing, surveying, and dewatering the Interior Borrow Lake ("IBL"). The IBL was one of the "borrow" sites the City designated as a source of fill material. Shortly after work began, MSI discovered that the materials in the IBL differed from what it expected. The excavated material consisted primarily of low plasticity sand and other non-conforming material.

Due to a lack of suitable material, MSI was forced to manufacture material by mixing sand with the limited quantities of clay. The contract was silent on the issue of manufacturing fill material.

---

[1] The PI, or plasticity index, is a measure of the stickiness of material. The higher the number, the greater the stickiness. Sand has low PI; clays have higher PIs.

Manufacturing material substantially decreased MSI's productivity and increased its costs. The parties discussed using fill from other sites that MSI believed were not designated as borrow sites under the contract. But using these sources was more expensive than the manufacturing process and, therefore, MSI persisted in manufacturing fill.

ICC informed the City of MSI's increased work on March 1, 1995. On May 30, 1995, the City indicated it would deny any claim contending that manufacturing fill was beyond the scope of the contract. ICC subsequently sought MSI's direct costs from the City and re-notified the City of its protest. The City eventually informed ICC that its May 30th decision was its final determination. The City, through the claims process, also denied claims for costs regarding trash removal, linear depth checking, surveying, and "extended performance." MSI performed 85% of all field work, and all of the claims presented, except the trash removal, were injuries to MSI.

The original subcontract between MSI and ICC provided, in part:

> In the event SUBCONTRACTOR has a claim for which the Owner may be responsible, the CONTRACTOR, in its sole discretion, may initiate with the Owner, at the SUBCONTRACTOR'S expense and which shall include attorney's fees, any dispute or claim procedures provided for in the Contract Documents for the use and benefit of SUBCONTRACTOR: otherwise SUBCONTRACTOR shall have full responsibility for the preparation of its claims and shall bear all expenses thereof, including attorney's fees.
>
> * * *
>
> CONTRACTOR shall be liable to SUBCONTRACTOR only to the extent of the amount, if any, actually awarded as a result of the disputes process: SUBCONTRACTOR shall be entitled only to the amount, if any, actually awarded as a result of the disputes process: and such amount when received by CONTRACTOR from the Owner shall satisfy and discharge CONTRACTOR from any and all liability to SUBCONTRACTOR for or on account of the acts or omissions of the Owner or its Architect or Engineer.

Hence, ICC was given the sole discretion to bring a claim against the City on behalf of MSI at MSI's expense. If such a suit was brought, MSI agreed to release ICC from further liability in exchange for whatever ICC recovered from the City.

ICC filed this suit on behalf of MSI against the City for breach of contract, quantum meruit, breach of implied warranty, and fraudulent inducement. Prior to the commencement of this action, on November 17, 1997, ICC and MSI entered into a detailed "Claims Presentation and Prosecution

3

Agreement" (the "Agreement")"concerning MSI's claims for significant project costs overruns due to the City's failure to disclose anticipated difficulties. The Agreement provides, in pertinent part:

> II. RECITALS
>
> * * *
>
> E. MSI represents that its Claim is based on the conduct of the City and that it has no other claims against Interstate except MSI's claim that is the subject of this Agreement.
>
> * * *
>
> G. Interstate and MSI agree that it is in their mutual best interests for Interstate and MSI to pursue a claim against the City of Dallas in the name of Interstate ("the Claim"). The Claim shall consist of MSI's Claim in the estimated amount of $4,062,584.00 plus a 15% markup for profit and overhead for Interstate and Interstate's own costs claim in the amount of $222,798.18 for jobsite costs and jobsite general and administrative costs associated with extended performance caused by the City's interference with performance of the Contract ("Interstate Claim"). The parties desire, therefore, to agree upon a procedure through which they will coordinate the preparation, presentation and prosecution of the Claim against the City of Dallas.
>
>
> III. TERMS
>
> * * *
>
> 1. MSI may pursue the Claim against the City in Interstate's name. Interstate shall cooperate fully with MSI including, but not limited to, passing on the Claim to the City and executing such documents that may be required to further the Claim to the City and executing such documents that may be required to further the Claim; and MSI shall cooperate fully with Interstate. MSI shall have the responsibility for the preparation of any claim, the presentation and prosecution of any such claim, and the conduct of any litigation.
>
> * * *
>
> 3. MSI shall diligently pursue the Claim. The right to abandon, settle, compromise or dismiss the Claim shall be shared by MSI and Interstate. Interstate and MSI shall each not settle the Claim without the others['] prior written approval.
>
> * * *
>
> 4. All costs, fees and other expenses (including expert and attorney fees) incurred by MSI in connection with the preparation, prosecution and litigation of the Claim shall be paid by MSI. MSI shall have no responsibility for any attorney fees or expenses that Interstate may elect to incur.
>
> * * *
>
> 6. From any amount paid in settlement of the Claim, Interstate and MSI shall be paid first for their respective markup (including profit and overhead). If the percentage of markup actually paid as part of any settlement or judgment is specified, the markup payable shall be calculated according to the June 21, 1995 Letter of Understanding agreement. If the markup is not specified then the settlement amount will be presumed to include a total markup of 15% and each party shall receive one-half of the markup or 7.5%. . . . The remainder of the settlement funds shall be prorated and paid between Interstate and MSI in the same percentage that each party's portion of the Claim (exclusive of markup) is to the total Claim (exclusive of markup) submitted to the City. . . . (examples omitted).

The district court allowed ICC to bring these claims on behalf of MSI.[2] Following an eleven day jury trial, the jury found that the City breached its contract with ICC. The jury also found the City breached an implied warranty to provide accurate and suitable plans and specifications in light

_____

[2] The City attempted to join MSI, a Texas Corporation, as a party, which would have defeated diversity jurisdiction, but ICC successfully resisted MSI's joinder.

4

of subsoil conditions at the Project.

On appeal, the City argues that the district court erred in concluding that ICC as general contractor could seek and obtain damages on behalf of its subcontractor MSI because there is a lack of privity of contract between the City and MSI. We note that it is undisputed that there was no privity of contract between MSI and the City, and that under Texas law privity of contract is an essential element necessary to any recovery in an action based on contract.[3] However, ICC argues that even though there is a lack of privity between MSI and the City, the district court was correct in permitting ICC, under Texas law, to present MSI's claim on a pass-through basis.[4] No controlling precedent from the Supreme Court of Texas or the Texas Courts of Appeals exists to resolve the issues created by the conflicting contentions of the parties.

### III. LEGAL ISSUES[5]

In breach of contract actions against the federal government, prime contractors have long been permitted to present subcontractors' claims on a pass-through basis against the government, even though the no-privity rule has barred subcontractors from recovering directly against the

---

[3] *Jenson Constr. Co. v. Dallas County*, 920 S.W.2d 761, 772 (Tex. App.–Dallas 1996, writ denied). In construction contracts, in the absence of an express agreement to the contrary, a subcontractor is not in privity with the owner and thus looks to the general contractor alone for payment. *City of LaPorte v. Taylor*, 836 S.W.2d 829, 831 (Tex. App.–Houston [1st Dist.]1992, no writ); *Corpus Christi v. Heldenfels Bros., Inc.*, 802 S.W.2d 35, 38 (Tex. App.–Corpus Christi 1990), *aff'd,* 832 S.W.2d 39 (Tex. 1992). The owner is liable for payment only to the general contractor. *City of LaPorte*, 836 S.W.2d at 831.

[4] "'Pass-through claims' are claims by an allegedly damaged party against an allegedly responsible party with whom it has no contractual relationship. These claims are presented by or through an intervening party in privity with both." Carl A. Calvert & Carl F. Ingwalson, Jr., *Pass Through Claims and Liquidating Agreements*, 18 CONSTR. L. 29 (Oct. 1998). The authors describe the function of "pass-through" claims as: "an attempt by the parties to avoid an extra layer of litigation (*i.e.,* litigation between themselves) with its attendant costs and risks by focusing on the party responsible." *Id.*

[5] We briefly discuss the background legal issues involved in this appeal solely to provide the context for our decision to certify the questions presented, without suggesting any opinion on the merits.

5

government.[6]  Similarly, a number of states have permitted pass-through claims in cases involving state government entities.[7]  However, the specific contours and requirements for pass-through claims vary from jurisdiction to jurisdiction.  For example, some states permit pass-through claims only when there is a liquidating agreement in place that meets certain requirements,[8] while others states permit pass-through claims when the prime contractor pleads the suit on behalf of the subcontractor and has an obligation to render the recovery to the subcontractor.[9]  The burden of proof also varies among

---

[6]  Henry R. Kates, *Facilitating Subcontractors' Claims Against the Government Through the Prime Contractor as the Real Party in Interest*, 52 GEO. WASH. L REV. 146, 150 (1983); *see also Severin v. United States*, 99 Ct. Cl. 435 (1943), *cert. denied*, 322 U.S. 733 (1944) (in a breach of contract claim against the federal government, a prime contractor may recover damages on behalf of its subcontractor only if the prime contractor suffered actual damages); *J.L. Simmons Co. v. United States*, 304 F.2d 886, 888 (Ct. Cl. 1962) (a prime contractor suffers actual damages if the prime contractor (1) has reimbursed its subcontractor for the subcontractor's damages; or (2) if the prime contractor remains liable for the such reimbursement in the future); *Folk Constr. Co. v. United States*, 2 Cl. Ct. 681, 685 (1983) (limiting the application of the *Severin* doctrine and holding that "a prime contractor is precluded from maintaining a suit on behalf of its subcontractor only when a contract clause or release completely exonerates the prime contractor from liability to its subcontractor").

[7]  *See, e.g.,Clark-Fitzpatrick, Inc./Franki Found. Co. v. Gill*, 652 A.2d 440, 449 (R.I. 1994); *Frank Coluccio Constr. Co. v. City of Springfield*, 779 S.W.2d 550, 551-52 (Mo. 1989) (en banc); *St. Paul Dredging Co. v. State*, 107 N.W.2d 717, 724 (Minn. 1961); *Roof-Techs Int'l, Inc. v. Kansas*, 57 P.3d 538, 550-53 (Kan. Ct. App. 2002); *Metric Constructors, Inc. v. Hawker Siddeley Power Eng'g, Inc.,* 468 S.E.2d 435, 438-39 (N.C. Ct. App. 1996); *Schiavone Constr. Co., Inc. v. Troborough Bridge & Tunnel Auth.*, 619 N.Y.S.2d 117, 188 (N.Y. App. Div. 1994); *Bd. of County Comm'rs v. Cam Constr. Co., Inc.,* 480 A.2d 795, 795 (Md. App. 1984); *Kensington Corp. v. Michigan*, 253 N.W.2d 781, 783 (Mich. Ct. App. 1977); *Buckley & Co., Inc. v. New Jersey*, 356 A.2d 56, 73-74 (N.J. Super. Ct. Law Div. 1975); *D.A. Parrish & Sons v. County Sanitation Dist. No. 4*, 344 P.2d 883, 888 (Cal. Dist. Ct. App. 1959).
We found at least five cases wherein the court did not allow a pass-through claim.  *See, e.g., Bd. of Governors for Higher Educ. v. Infinity Constr. Servs., Inc.,* 795 A.2d 1127, 1129 (R.I. 2002); *Farrell Constr. Co. v. Jefferson Parish,* 693 F.Supp. 490, 498 (E.D. La. 1988); *Dep't of Transp. v. Claussen Paving Co.,* 273 S.E.2d 161, 164 (Ga. 1980); *Barry, Bette & Led Duke, Inc. v. New York*, 669 N.Y.S.2d 741, 743 (N.Y. App. Div. 1998); *APAC-Carolina, Inc. v. Greensboro-High Point Airport Auth.*, 431 S.E.2d 508, 511-12 (N.C. Ct. App. 1993).

[8]  *See, e.g., Bovis Lend Lease LMB Inc. v. GCT Venture, Inc.,* 728 N.Y.S.2d 25, 27 (N.Y. App. Div. 2001) (a liquidation agreement has three basic elements: (1) the imposition of liability upon the general contractor for the subcontractor's increased costs, thereby providing the general contractor with a basis for legal action against the owner; (2) a liquidation of liability in the amount of the general contractor's recovery against the owner; and (3) a provision that provides for the "pass-through" of that recovery to the subcontractor); *Barry, Bette & Led Duke, Inc.*, 669 N.Y.S.2d at 743 (holding that a showing of actual contractual liability on the part of the contractor is necessary in order for a pass-through claim to be permissible).

[9]  *Frank Coluccio Constr. Co.*, 779 S.W.2d at 551-52.

6

jurisdictions.[10]  Accordingly, in light of the absence of Texas authority on these issues and the varied interpretations of these issues by other state courts, we certify the following questions to the Supreme Court of Texas and the Honorable Justices thereof.

## IV. QUESTIONS CERTIFIED

(1) Does Texas law recognize pass-through claims, *i.e.,* may a contractor assert a claim on behalf of its subcontractor against the owner when there is no privity of contract between the subcontractor and the owner?

If the first question is answered in the negative, then the remaining question need not be reached.  However, if the first question is answered in the affirmative, the following question must be reached:

(2) What are the requirements, if any, that need to be satisfied for a contractor to assert a claim on behalf of its subcontractor when there is no privity of contract between the subcontractor and the owner and who holds the appropriate burden of proof?

## V. CONCLUSION

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the questions certified.  The answers provided by the Supreme Court of Texas will determine these issues on appeal in this case.  The record of this case, together with copies of the parties' briefs, is transmitted herewith.

**QUESTIONS CERTIFIED**.

---

[10]  *Compare Frank Coluccio Constr. Co.,* 779 S.W.2d at 552 (holding that the government/owner has the burden of proving that the prime contractor has been relieved of responsibility to pay any recovery to the subcontractor); *Cam Constr. Co., Inc.,* 480 A.2d at 799 (same); *Kensington Corp.*, 253 N.W.2d at 784 (same) *with Claussen Paving Co.,* 273 S.E.2d at 164 (holding that prime contractor must prove that it is liable to the subcontractor before it can assert a pass-through claim); *Wexler Constr. Co. v. Housing Auth.,* 183 A.2d 262, 264-65 (Conn. 1962) (same).